Mr. Fink. Good morning. May it please the Court. The first issue here is whether or not the Dristic District Court erred by allowing the government to refuse to supply use immunity to one of its witnesses or one of the defense witnesses, Norma Bolander. She was previously a witness for the government, had been listed for a witness of the government, had been subpoenaed by the government, and at the last minute they declined, before trial, they declined to call her. The defendant in turn decided to call Ms. Bolander and mostly because her testimony here was central to the defendant's case. She would have been the only witness who could have testified regarding what the Achavias in this case, the co-defendants in this case, asked of Ms. Newton and to what lengths the Achavias went to hide their schemes from employees. She's the only other employee who was listed as a QA at the time. Is there any authority that you can say to the government who would compel the government to issue immunity? I get the government can't interfere with the fact-finding process and if the government threatens a witness or something like that, does something affirmatively to keep them off the stand, that might be a problem for the to ever give a witness immunity under any circumstances. We're not aware of a case in the Seventh Circuit where the court has decided to, has found that a court erred in not granting immunity. And I assume you're not aware of any in the Supreme Court either. No, we're not, Your Honor. Well, you know, zero for closing in on 250 years of the existence of this constitutional right is a pretty steep number. I understand that, Your Honor, and that's why we ask you primarily to look to other, for guidance in this case, if there is a clear rule, to other circuits, specifically the Third Circuit and the Ninth Circuit. The Ninth Circuit, for example, has said that in cases where, the test in general, which the Seventh Circuit is part of, which the Seventh Circuit recognizes, is whether or not denial would so distort the fact-finding process that it denied the defendant the right to a fair trial. For the Ninth Circuit, they've said, they've ruled that one example of this would be where the proposed witness's testimony would directly contradict that of an immunized witness. There are multiple instances or examples in this case where Bollinger's testimony would have directly contradicted and... Is there some particular case you're relying on where the Court of Appeals held that this was actually required by the Constitution? I could be wrong, but I believe that Quinn, the Third Circuit case that we cited, was an example of that. Quinn, all right. Take a look. And I believe also in the Ninth Circuit, the case with Straub that we cited on page 18 of our opening brief. I'm sorry, you're going to have to raise your voice on this. No, no, don't count on the microphone. This is a very big room. The microphone records. You have to fill the room. Thank you. So I didn't get your last statement. The last statement was, I believe that Straub in the Ninth Circuit is the case that we cited on page 18 of our opening brief. You should continue. So the examples of... So to return to the judge's question, examples of her testimony or Bollinger's testimony that would directly contradicts the testimony in this case. One, if Bollinger was able to be questioned as to what training, if any, Newton received under... Did you ever proffer to the district court what you believed the answers to those questions would be? No, we did not take the opportunity to do that. We did proffer to... Our instruction was to work with the prosecution to see whether or not there were any stipulations that could be drawn out as a result of Bollinger not being able to be questioned. So that's part of the record and we don't have this. And I think the government makes a compelling argument that Bollinger's testimony probably would have hurt the defendant. And the reason I say this is that it sort of puts the defendant in these cases in sort of a tails-I-win- head-you-lose situation. You know, the witness takes the Fifth Amendment and you can argue for a new trial because maybe Bollinger was able to be Bollinger's testimony would have supported the defendant's case. The government says, no, it wouldn't have. And it doesn't seem to me there's any contrary evidence that it would have. And a new trial probably can only benefit your client. Does that make sense? So shouldn't you have had some obligation to say, look, if Bollinger would have testified, Bollinger would have testified as follows. And we could conclusively establish that Bollinger's testimony would have supported the defendant's case. In our post-trial motions, we made that argument. We advanced in front of the district court what the testimony that Bollinger would have provided that would have been- No, wait. You answered Judge Kirsch's question by saying that the defense did not make an offer of proof. I understood his initial question to be whether or not we made an offer of proof at trial. Yeah, well, that's what the rules of evidence require in order to preserve a point for They require an offer of proof at trial. I just want to be very clear about your answer. Was an offer of proof made at trial? I don't believe there was. Okay, thank you. But to get to the judge's other point about whether or not some of her testimony, and this is why how I understood the question to be regarding the record that was developed in the post-trial motions, the government has argued that some of Bollinger's testimony would have been harmful to defendants and wouldn't be exculpatory in any way. The law is pretty clear that even if testimony might have a tendency to be harmful to the defendant's case in some way, that doesn't render any of the portions that would be exculpatory not exculpatory. And in this case, this witness is the one who would have the most information over the longest period of time regarding the defendant's involvement in this case. She was central for us to explaining what a QA in the case would have testified, that she's not a QA, she was just a secretary. There are other points that Bollinger would have been able to provide that are laid out in the brief that in numerous circumstances this recycling of patients that the government has argued was an example of the fraud happened in all of the other home care agencies which Bollinger previously worked at, and that it's only a specific type of recycling that would have been indicative of any kind of fraud or should have put Newton on notice that this involvement in her scheme was fraudulent. While you were talking, I went back and looked at the Third Circuit's opinion in Quinn. Quinn's conviction was affirmed, not reversed. Then I would amend my statement to say that. So is there any other case where you think that a court has definitively held that the Constitution required a grant of restitution as a result? Standing here, I'm not aware of one. Okay, thank you. I'd like to hear more about restitution. Do you agree with the government that we should be looking at the conspiracy as a whole and not just Newton in terms of the loss amount? So as far as the loss amount goes, and I think this is an issue that goes even beyond restitution, the government's only offer of proof at as an example or just as proof of what this conspiracy should, or what Newton's involvement in this conspiracy, should amount to for loss amount. That simply isn't enough to meet their burden here. What was the alternative calculation set forth by the defendant? Our alternative as we advanced at sentencing was the loss that she actually benefited, that is her salary that she she gained as a result of this. But that's easy for the district judge to reject, right? There's no support for that. Well, there is suspect that actual gain, when it's not reasonably ascertainable, the loss amount, or the government doesn't provide evidence to support the loss amount, that as an alternative, the gain to the defendant, not the loss, can be used as a substitution. Was it, even if the judge made an error in determining the loss amount, was it harmless? We don't believe so. This loss amount is extremely central to the calculation of the get up into these large loss amounts. And the judge ultimately sentenced below the guideline range anyway, right? The judge did sentence below the guideline range, not significantly below, but the loss amount is the primary mover in terms of this. I believe it added 18 points in this case. Yeah, but could you, I guess, could you have gotten to a lower loss amount? Because I thought the range was something like, you know, the range is a wide range and your client is kind of at the top, closer to the top of the range than the bottom, but how do you get below that, you know, how do you get to plus 16 instead of plus 18, except for using her salary? Yeah, I don't think I understand your Honor's question. My understanding is that it would have been significantly lower, the range that would have portioned. It wouldn't have come up close to, you know, 7 million and it wouldn't, I think the range is 2.5, 2.5 or 3 to 7, yeah. And she was, she was earning at the time between $16 and $20 an hour over the course of seven, seven years. And even then, there's a significant question as to how much time during that time she actually worked as part of this scheme. Around, the testimony was around 2015, the care specialist transitioned from this paper note-taking practice to completely digital. That is, the nurses just entered their notes directly. There's no way that the scheme is described here that Newton could have been involved in that after late 2015. So, if the scheme began in 2011 and ended in mid-2017, that cuts off a significant amount of time that she would have actually, that the gains that she received from this scheme would contribute to the loss amount as well. As far as Judge Kirsten's question about harmless, you referenced it, you know, it went to the guidelines and then, of course, we know we have our case law about the guidelines having an anchoring effect, even if a judge ends up below the guidelines. But isn't part of the answer about restitution, too, she was, after all, she's liable jointly and severally with the two owners of the company. And it would be, that restitution would be mandatory. So, the finding of the loss amount here, absolutely, is not, that error is not harmless with respect to how much she has to, she is personally required to compensate the governor to pay as a result in restitution. Unless there are any further questions on these points, I'd like to reserve my time. Certainly, counsel. Thank you. Mr. Winn. Good morning, your honors, and may it please the court. Connor Winn for the United States. Newton's conviction and sentence should stand. Her trial comported with due process and the district court sentencing findings and below-guideline sentence were substantively reasonable. Based on the argument, the government intends to talk about Miss Newton's inability to call Norma Belender at trial and on the district court's loss calculations. We're happy to rest on the briefs for the remaining arguments, unless the panel has any questions about those. Starting first with Miss Newton's inability to call Norma Belender. As we just heard, the Seventh Circuit has adopted a two-part framework for determining when the government potentially violates due process because it denies a witness use immunity at the defendant's request. First, there's the question of whether that witness's testimony, or the exclusion of it, distorts the fact-finding process. And that's the first point I'd like to make here. It's not a question of whether Miss Belender potentially had something exculpatory, something that might have benefited Miss Newton. It's a question of whether, on balance, taking everything that she would have testified to when subjected to direct and cross-examination by the government, the proceedings below. And that's the first analytic question for this court to confront. The second question... Certainly. But I want to ask you the same question I asked Mr. Fink. Are you aware of any case that has actually held that it was a violation of the Constitution not to grant use immunity to a potential defense witness? I'm not aware of any case within this circuit, certainly. Are you aware of any case in any circuit? Not at this point in time. I don't want to represent that no such case has ever existed, but I have not located one. If there are no such cases, it's very difficult to say there's a two-part test identifying when such and such happens. If X has never happened, how does one describe a two-part test for when X happens? It's all hot air. Until some court has held that there was a violation of the Constitution, I don't know how one can describe a test. We can describe many ways in which contentions of this sort have failed. And if you want, you can go back at least 70 years where arguments of this sort have been made, ever since the immunity statute was enacted in the 1960s. And none has ever succeeded. I just don't know where tests come from. Very well, Your Honor, then abandoning the language of tests. This contention should fail, like so many others have before it, for two reasons. First, the fact-finding process wasn't distorted. And second, this court has repeatedly turned away such contentions when there's no evidence of prosecutorial bad faith or misconduct. And nothing of that sort occurred here. In fact, Ms. Newton has disputed whether or not that would actually be a requirement for a successful due process claim. I do think this court's jurisprudence suggests that it does. That's both based on right and schways. In the absence of such prosecutorial bad faith, use immunity claims like this fail. Now, there was a little bit of a discussion earlier, I think, as to whether Ms. Newton even preserved the use immunity claim. She certainly did not. She proposed a stipulation to the government, and she asked the government, out of court and off the record, to provide use immunity to normable lender, but never re-raised that issue with the district court on the record, and to give the district court the opportunity to rule on the propriety of such a grant of use immunity. If that sort of claim could be preserved, Puckett's contemporaneous objection rule would be void. It would mean nothing. So that claim is certainly reviewed for plain error, and that already makes a claim of error that has never been accepted, certainly by this court and potentially by any others, nearly impossible to carry. Not only is that because of the merits, that's also because of an attempting to examine what sort of impact the lack of Ms. Bullender's testimony at trial had. The simple answer is that there is none. As the district court recognized in its ruling on the motion for a new trial, hadn't Ms. Bullender testified, she would have harmed Newton's case on balance. Let me ask you what is a greater concern of mine. Mr. Fink didn't mention it, but the concern of mine is, did Judge Kendall ever rule that the potential witness had a privilege not to testify? Yes, Your Honor, I believe that she did. The district court accepted Ms. Bullender's invocation. That's not the question I asked. The judge said pretty much, I don't know enough to know whether you've got a good claim, so I'm accepting your claim. Isn't that a refusal to rule? That's a pretty important point, I should think. Your Honor, I think that actually accords with this court's case law. I'm not asking about this court's case law. I'm asking whether the district judge ever ruled that the witness actually had a privilege not to testify. Yes, Your Honor, it's a ruling. And the reason for that is because when there is a question as to whether or not a witness might be exposed to criminal liability, a district court is required to basically afford the invocation the benefit of the doubt. If the district court is uncertain, says, I can't say for sure whether or not this will expose you to prosecution, then in that case, the witness's Fifth Amendment right against self-incrimination trial— As conflicted as I understand it, was a claim about the running of the statute of limitations. If limitations had run, the witness is not exposed to prosecution. If limitations has not run, the witness is exposed to prosecution. Why doesn't the district judge have to determine whether the period of limitations has run? I think that's because in situations like this, when the statute of limitations runs, especially given that it would have interacted here with the withdrawal defense and the potentiality of that affirmative defense, that's a fact-intensive question. And that would have required the district court to— Suppose the assertion of privilege was the lawyer-client privilege. And the other side says, no, one of the exceptions to the lawyer-client privilege is the crime-fraud exception. You have to determine whether these statements were made in the context of a crime. That's going to require an evidentiary hearing. District judge can't say, well, the parties have opposing views, so I'm just honoring the claim of privilege. It would be reversed pretty quick. Why isn't this the same kind of problem? I think at bottom, Your Honor, that's because the district court did hear from Ms. Belender's counsel and had been sitting throughout trial during the course of events. Her ruling didn't come out of a vacuum. She had heard testimony from a number of witnesses who, in fact, talked about aspects of the scheme at care specialists that revealed Ms. Belender's potential criminal liability. As to the statute of limitations part in particular, it became clear during those proceedings and during the colloquy that Ms. Belender had left care specialists in January of 2015. That alone, however, doesn't amount to a withdrawal. So the district court wasn't presented with the sort of affirmative evidence suggesting that the statute of limitations had even begun to run. In fact, as far as the district court was aware, there was no evidence suggesting a likelihood of a successful withdrawal defense. Therefore, the statute of limitations argument was, to a certain extent, just completely unviable on the record presented to the district court. Now, even to the extent that the district court maybe should have engaged in a more thorough colloquy, I think this court's decision in Wright explains that the remedy in such a situation would be a remand to the district court to give a more fulsome explanation, not a new trial. But such a remand wouldn't even be necessary here. You should look up the meaning of the word fulsome. A more full account, then. Fulsome and full are totally different words. A more full account. Fulsome is an insult. Yes, Your Honor. A more full account, then, of the district court's colloquy. But such a remand wouldn't be necessary or helpful here. In fact, to the need that such a thing was necessary, it's harmless error. And I think you can see that based on the documents that Ms. Newton submitted alongside her motion for a new trial. The discovery exhibits that would have revealed what Ms. Belender's likely testimony and potential criminal liability here under the statute of limitations may be only confirmed the district court's decision not to compel her to testify. So to the extent that there is any concern with the thoroughness, the government would submit that that's harmless error and doesn't justify a remand in this case. I want to ask you about loss amount. How many nurses were doing field visits at care specialty? So there were a number of nurses working at care specialists throughout the year. It's not just one or two. I can't give you the exact number because it was shifting throughout the years. But there were many of them. I think what's notable is Ferdinand Eshavia, one of the masterminds here. The testimony in the trial record suggests that he was the nurse, at least for significant amounts of time, involved in the discharge and admission of patients. So he would have been the only one to meet with a patient when they were entering care specialists' care for home health services. And then, of course, we know that he was involved in a number of fraudulent practices. So the notes he would have submitted to Medicare saying, we are admitting this patient into our care, those would have been fraudulent and tainted. And that would have tainted virtually every patient. So I think we do have in the record, I mean, we have exhibits and org charts showing a number of nurses, as you say. So there was record evidence about a number of nurses. So that's 6.3 million. Is that based on 90% of what Medicare reimbursed for all the nurses? Or is that 90% of what Medicare reimbursed for specific nurses like Ferdy and Ornate, who the government at trial presented evidence of fraud by? So the 90% figure isn't necessarily, it's not just about Ornate and Ferdinand Eshavia. The patients that they specifically saw, although we would say that Ferdinand Eshavia saw nearly every patient at care specialists, probably at one time or another. I think the trial evidence supports that, and that was the district court's conclusion of sentencing too. But it's not necessary to go down that route to really get to the 90% figure here. And that's because the evidence at trial kind of established that the fraud at care specialists was pervasive. There's a number of different types of fraudulent schemes going on, and each of them contaminates or taints the claims submitted to Medicare. And the vast majority of the schemes contaminated these claims in such a way that Medicare would have offered no reimbursement whatsoever. There are situations where Medicare might offer some sort of reimbursement for a service, but that's often only if the patient is in home health care according to the regulatory definitions that Medicare sets out. If that's not the case, Medicare won't afford any payment or reimbursement. And so three examples here where no reimbursement would have been given whatsoever. First, to the extent that any of these patients weren't in fact homebound, that would lead to no reimbursement from Medicare. And those are the competing estimates given from some of the nurses in this case. There's the 90% figure from Mr. Onate at trial, and then there's the 50% figure from Mr. Magno in an interview he conducted with the government that was submitted to the district court. There was no doubt evidence of widespread fraud. I'm trying to pinpoint the evidence that all of care specialties' business was a fraud. That none of what Medicare reimbursed would have been legitimate. Because that was the basis of the district court's finding. Right. So where was that evidence? So it's the overlapping nature of these schemes, right? But even when you look at their plea, they pled to certain types of fraud. In their plea, they never said that everything they did at care specialists was a fraud. No, they didn't say that in their plea agreements. I mean, that would be an unusual amount of depth to go into in a plea agreement. And they probably had selfish reasons not for doing so because of what that could have exposed them to at sentencing. That would be a confession that would affect their loss calculation. So I don't think that's particularly surprising. But the loss calculation here is nearly 100%. It's the same effect. Right. Well, 90%. 6.3 million. And I think, to the extent Your Honor has some concerns about the loss calculation, I think it's important to remember what Judge Kirsch was discussing with the government. Is that in order for there to be clear, reversible air on this front, Ms. Newton needs to demonstrate a loss amount delta of $2.8 million. That's how much of a reduction would need to happen here in order for the sentencing guidelines calculations to change. That would drop her into the 16 base point offense level versus 18 points. And I think that there are a number of easy ways to just sort of reach the $3.5 million and $1 figure here. Whether that's looking at the homebound payment. But her actual restitution amount is not that $3.5 million part of the range. It's $6.3 million. And, Your Honor, with regards... So how can you explain that as harmless? Well, Your Honor, with regards to restitution, the first thing that the government would say is that's waived. Ms. Newton has never challenged in any of her briefing here the district court's restitution order. She has challenged the loss amount for her sentencing calculations. But on restitution, she's been silent. And we think that that amount is supportable ultimately for the same reasons that we think the district court didn't commit clear error with regards to the sentencing guidelines. I see my time has expired. If the court has no further questions, the government is happy to rest. Thank you, Mr. Wynn. Anything further, Mr. Fink? Thank you. I just want to address two points, the first being the issue regarding the course determination of whether or not there was a privilege and the analysis that it performed. The first point that we want to make regarding that is the government argued that the court had been sitting throughout the entire trial and therefore was aware, in its opinion, argued that it was aware of all of the inculpatory evidence that might have possibly exposed Bollinger to liability. Yet in the district court's decision, in its opinion, it didn't cite to any trial evidence for that proposition. And in its ruling at trial, it did not refer specifically to any inculpatory evidence that might suggest the need or that Ms. Bollinger's invocation of the Fifth Amendment was reasonable, that there was a clear danger of liability. Was there any evidence submitted by the defendant that she withdrew from the conspiracy? Because I think the statute of limitations issue is different than Fifth Amendment concerns. She clearly had criminal exposure, okay? There's no doubt about that. She clearly had criminal exposure. The question is whether or not the statute of limitations on that criminal exposure had expired. And the district judge sort of said, well, I don't have enough information. Well, I think that was the question that Judge Easterbrook had asked. But the statute of limitations issue, is there any evidence that the defendant submitted that she had withdrawn from the conspiracy so the judge could have made a decision saying, look, you don't have any criminal exposure because the statute has run? So the defendant didn't submit this, but the counsel who had been appointed that morning for Bollinger alluded to this when he said that there was a letter that she wrote in October 2015 that was a clear withdrawal from this conspiracy. That's the whistleblower letter that Bollinger drafted. But a withdrawal in 2015 still leaves her exposed to criminal liability, right? And the trial occurred less than five years. Exactly. And the other issue is that she left in January of 2015. Well, the prosecution says February. The prosecution says as of the date of trial, if she was treated as having withdrawn in February 2015, there's still seven months left to go. I believe that's incorrect, Your Honor. So you think it's six? Sorry? You just measure the amount of time between the supposed withdrawal and the date of trial. Right. And our understanding is that she left CARE Specialists in January of 2015. All right. When was the trial? The trial was in February of 2020. All right.  Correct, Your Honor. And furthermore, we just don't know. And it would have been easy for the judge to ask her. It wouldn't have taken long and it wouldn't have implicated her Fifth Amendment. She could have… Well, it would have implicated her Fifth Amendment. That's the problem. Well, she could ask her when she left and whether or not she made any other statements regarding her awareness of fraud at CARE Specialists. Yes. Depending on the phrasing of the question, it's possible that it might have implicated her Fifth Amendment rights, but we're unclear as to how else the defense could have proceeded in this situation, having just found out that the government wasn't intending to call her and was not willing to provide use immunity in this situation. Under these circumstances, we're kind of at a loss as to what we could have done otherwise to determine whether or not the statute of limitations applied to her. And a counsel who, without the benefit of discovery, was appointed to her that morning certainly wasn't able to do so. All right. Thank you, Mr. Fink. Mr. Fink, the court appreciates your willingness to accept the appointment in this case and your assistance to the court as well as your client. The case is taken under advisement.